Argued and submitted October 29, 2008, decision of Court of Appeals and order
of Columbia River Gorge Commission affirmed July 16, 2009

# FRIENDS OF THE COLUMBIA GORGE, INC.,
Collyn Baldwin, Claudia Curran, Eric Lichtenthaler,
Phil Pizanelli, Dixie Stevens, Kimberlee Thorsell,
Peter Thorsell, Brian Winter and Cynthia Winter,
*Petitioners on Review,*

*and*

Beverly KLOCK
and Clair Klock,
*Petitioners,*

*v.*

COLUMBIA RIVER GORGE COMMISSION,
*Respondent on Review.*

(CRGC No. PA 05-02; CA A131299; SC S055916)

213 P3d 1191

Gary K. Kahn, of Reeves, Kahn & Hennessy, Portland, argued the cause and filed the brief for petitioners on review.

Jeffrey B. Litwak, White Salmon, Washington, argued the cause and filed the brief for respondent on review.

GILLETTE, J.

## GILLETTE, J.

This administrative law case is one of three filed by the Friends of the Columbia Gorge and others (Friends), challenging various actions by the Columbia River Gorge Commission (the commission) under the Columbia River Gorge National Scenic Area Act (the Act) and the Columbia River Gorge Scenic Area Management Plan (management plan). In this case, Friends challenges certain aspects of a 2005 amendment to the management plan, asserting that they are inconsistent with the Act. On review, the Court of Appeals concluded that the amendment to the management plan did not violate the Act in any of the respects asserted by Friends. *Friends of Columbia Gorge v. Columbia River (A131299)*, 218 Or App 232, 179 P3d 706 (2008). In this court, Friends contends that the Court of Appeals applied the wrong legal standards to its review of the commission's actions and asks this court to reverse and remand the Court of Appeals decision for reconsideration under the correct standards. We allowed review and now affirm the decision of the Court of Appeals.

To understand the issues in this case, a brief summary of the legal background is necessary.[1] In 1986, Congress passed the Columbia River Gorge National Scenic Act, 16 USC §§ 544-544p, which created the Columbia River Gorge National Scenic Area in Oregon and Washington. The purpose of the Act was to protect the scenic, cultural, recreational, and natural resources of the Columbia River Gorge, and to protect and support the economy of the area by encouraging growth in existing urban areas and by allowing future economic development while protecting the area's resources. 16 USC § 544a.

The Act authorized Oregon and Washington to enter into an interstate compact and to create a regional agency, the Columbia River Gorge Commission. The commission, in

---

[1] Additional details concerning the statutory, regulatory, and procedural background of the commission's actions are provided in the two related cases between the same parties that this court decides today, *Friends of Columbia Gorge v. Columbia River (S055722)*, 346 Or 366, 213 P3d 1164 (2009) (*Friends (S055722)*); and *Friends of Columbia Gorge v. Columbia River (S055915)*, 346 Or 415, 212 P3d 1243 (2009).

cooperation and consultation with the United States Secretary of Agriculture, would be charged with developing and implementing a land use management plan for the "scenic area," which includes approximately 292,000 acres of land along both sides of the Columbia River.[2] The Act divided the scenic area into three kinds of subareas: urban areas, which are not subject to scenic area regulations or the management plan, 16 USC 544b(e); "special management areas" (SMAs), which comprise the more than 100,000 acres of land within the scenic area that are deemed the most sensitive, 16 USC 544b(b); and the areas in which the remaining land in the scenic area is located, which are referred to as "general management areas" (GMAs).[3] It also established a framework within which the management plan was to be developed, implemented and administered. Among other things, that framework directed the commission to carry out studies and inventories of the features, uses, and resources of the land within the scenic area and required the commission to use the resulting studies and inventories to designate areas within the scenic area that are suitable for various specific uses. 16 USC § 544d.

As authorized by the Act, Oregon and Washington established the Columbia River Gorge Commission, and, in 1991, the commission adopted a management plan for the Columbia River Gorge. The Act requires the commission to undertake a comprehensive review of the management plan at least every ten years and authorizes the commission to make any necessary revisions, subject to the review and concurrence of the Secretary of Agriculture. 16 USC § 544d(g). In accordance with that requirement, over the next few years, the commission reviewed whether and in what ways the management plan should be revised, and, in 2004, the commission adopted certain revisions to the plan.

---

[2] The scenic area includes land in Multnomah, Hood River, and Wasco counties in Oregon, and Clark, Skamania, and Klickitat counties in Washington.

[3] The phrase "general management area" is not defined in the Act, but the commission uses that phrase throughout the management plan to refer to the remaining land in the scenic area. In addition, the statute that the Oregon legislature enacted to implement the Act, ORS chapter 196, defines the phrase to mean "the area within the scenic area that is not an urban area or special management area." ORS 196.105(2).

The Act also permits the commission to amend the management plan "at any time that conditions within the scenic area have significantly changed." 16 USC § 544d(h). The commission adopted rules governing the amendment process, which are published in Oregon at OAR chapter 350, division 50.[4] The rules set out procedures for citizens to initiate the amendment process, either by requesting the commission to initiate a legislative amendment to the management plan or by filing an application for a quasi-judicial amendment to the plan. OAR 350-050-0040. The only substantive criteria for the commission's approval of an amendment application are set out in OAR 350-050-0030:

"The Commission must find the following criteria are satisfied before it approves an amendment to the Management Plan:

"(1) Conditions in the Scenic Area have significantly changed. This means:

"* * * * *

"(b)   new information or inventory data regarding land uses or resources that could result in a change of a plan designation, classification, or other plan provision;

"* * * * *

"(2)   The proposed amendment is consistent with the purposes and standards of the Scenic Area Act; and

"(3)   No practicable alternative to the proposed amendment more consistent with the purposes and standards of the Scenic Area Act exists."

Under that authority, the commission has amended the management plan a number of times. As pertinent here, in 2005, the owner of the View Point Inn, a building in Multnomah County that is listed on the National Register of Historic Places, submitted an application to the commission

---

[4] The commission's rules also are on file at the commission's office and can be found on its web site at http://www.gorgecommission.org/otherrules.cfm. The commission amended its plan amendment rules in 2006, after its adoption of the plan amendment at issue in this case, to, among other things, change the order of the second and third amendment criteria in OAR 350-050-0030, and in other ways that do not change our analysis of this case. Accordingly, we refer to pertinent rules using their current OAR citations.

to amend the management plan to permit him to use the property for a commercial purpose consistent with its historic use as an inn and a restaurant. The application proposed an amendment to the management plan that would have allowed historic properties in the scenic area that were listed on the National Register before November 17, 1986, to be used for restaurant or hotel purposes if that is how the property had been used historically. The application also stated that the purpose of the proposal was to allow the View Point Inn to generate sufficient income to support its restoration.

In the course of considering that application, the commission began to question how well the management plan protected historic buildings in the scenic area. Ultimately, the commission decided to consider expanding the scope of the proposed amendment to address the protection of such buildings more generally.[5] It directed its staff to commission an inventory of all historic buildings in the scenic area; to evaluate the uses that were then allowed in those buildings, as well as those that could be allowed to improve protection of those buildings; to conduct a survey of how other jurisdictions encourage preservation of historic buildings; and to assess whether possible new uses of historic buildings would be consistent with the purposes and standards of the Act.[6] With that information in hand, the commission voted to table the View Point Inn application for the time being and determined, instead, to devise a broader plan amendment dealing with all historic buildings in the scenic area.

The commission eventually proposed substantive modifications to the applicant's proposed plan amendment,

---

[5] As a practical matter, the only property in the scenic area that would have qualified under the applicant's proposal to engage in the specified commercial uses was the View Point Inn, because that was the only property on the National Register for Historic Places prior to November 17, 1986, that originally was used for restaurant and hotel purposes.

[6] The survey revealed that there were four properties in the scenic area that were listed on the National Register of Historic Places, all of which were located in Multnomah County. In addition, 18 properties in the scenic area previously had been determined to be eligible for listing under the criteria set out in 36 CFR § 60.4 for listing in the National Register, and 36 others were deemed to be potentially eligible for listing.

set a hearing date, and gave the public notice and an opportunity to comment on the proposed modification. At the conclusion of that process, the commission issued a final order finding the three criteria required to support a plan amendment under OAR 350-050-0030 and adopting Plan Amendment (PA) 05-02, which is the subject of this proceeding. With respect to amendment prerequisites set out in OAR 350-050-0030, the commission found, first, that conditions in the scenic area had changed significantly. OAR 350-050-0030(1)(b). Specifically, the commission found that new information and inventory data regarding historic buildings obtained through the review process showed that certain cultural resources—historic buildings—were not being well protected under the management plan and, in fact, were deteriorating. The commission also found that the management plan had not adequately anticipated the difficulty of maintaining historic buildings over the long term as a cultural resource in the scenic area.[7]

Second, the commission found that there was no practicable alternative to its proposed amendment that would be more consistent with the Act. OAR 350-050-0030(3). In that regard, the commission first discussed the parameters of that criterion. The commission stated that consideration of whether there is a practicable alternative begins with the initial proposed plan amendment—to be an "alternative" to that proposal, other suggested options have to satisfy at least the same purpose as the initial proposal, and to be "practicable," the options must be things that can be done, considering technology and cost. *See* Management Plan, Glossary (so defining the word "practicable").[8]

---

[7] In the final order, the commission noted that the survey that it had commissioned revealed that, since the adoption of the management plan, many historic buildings, including some significant ones, had already been lost through demolition or incompatible alterations, and others were threatened by disuse or poor maintenance. In addition, the consultants who conducted the survey interviewed the owners of properties either on or eligible for listing on the National Register, and observed that virtually all of them were concerned about the high cost of restoring, rehabilitating, and maintaining historical buildings in a manner that would preserve their historic integrity.

[8] In this opinion, when we refer to the "management plan," we are not referring to a particular paper document, but to the entire body of law that comprises the management plan, including revisions and amendments that currently are in effect. An up-to-date version of the management plan is available online at

In this case, the purpose of the initial View Point Inn proposed plan amendment was to allow an adaptive reuse of that property in a manner likely to generate enough revenue to support the restoration of the structure. The commission found that its own modification to the initial proposed plan amendment, PA 05-02, was a practicable alternative to that initial, limited proposal because it was consistent with the purposes of that proposal. The commission also found that PA 05-02 was more consistent with the Act because it provided protection and enhancement of cultural resources not covered by the initial View Point Inn proposal and contained criteria designed to ensure that permissible uses of historic properties did not adversely affect other resources in the scenic area.

Finally, the commission considered and rejected several other proposed modifications to the View Point Inn plan amendment, including "an alternative" (which the commission summarized by listing nine key elements) that Friends had suggested, on the ground that they were not practicable alternatives to the initial proposed plan amendment or that they were not more consistent with the purposes and standards of the Act than the commission's own proposed modification. In the end, the commission found

"that there is no practicable alternative to [PA 05-02] that is more consistent with the purpose and standards of the Act. [PA 05-02] provides the most comprehensive protection to historic resources of any alternatives considered, while also being consistent with the purpose of the Applicant's Proposed Plan Amendment. For these reasons, the Commission concludes that [PA 05-02] satisfies the requirements of [OAR 350-050-0030(3)]."

Third, the commission found that PA 05-02 was consistent with the purposes and standards of the Act, OAR 350-050-0030(2), insofar as it allows historic buildings to be used in a manner that protects their historic integrity and facilitates public appreciation of those buildings as significant cultural resources. At the same time, by requiring that the new

http://www.gorgecommission.org. When we cite provisions in the management plan in this opinion, we make an effort to give sufficient information to permit the reader to find the provisions we discuss, but we do not attempt to refer to a particular document, online or on paper, or to any page numbers therein.

uses of historic buildings meet new and existing guidelines protecting other scenic, cultural, natural, and recreational resources in the scenic area, PA 05-02 ensures that the additional uses of the historic buildings permitted in the plan amendment do not adversely affect those other resources. Finally, the commission found that, by allowing limited commercial uses of historic buildings, PA 05-02 also was consistent with the second purpose of the Act, to protect and support the economy of the area.

Having made those findings, the commission approved PA 05-02, which added provisions to the management plan permitting certain new commercial uses of historic buildings in the GMA. First, PA 05-02 added the following policy statement to the chapter in the management plan dealing with cultural resources:

"20. Provide incentives to protect and enhance historically significant buildings by allowing uses of such buildings that are compatible with their historic character and that provide public appreciation and enjoyment of them as cultural resources."

Part I, ch 2 (Cultural Resources), GMA Provisions, GMA Policies 20. In addition, it added a new section to the management plan that, among other things, expressly permits the following commercial uses of historic buildings:

### "GMA Guidelines

### "Additional Review Uses for Historic Buildings

"1. Properties in all GMA land use designations except Open Space and Agriculture-Special with buildings included on the National Register of Historic Places shall be permitted to be open to the public for viewing, interpretive displays, and an associated gift shop * * *, subject to compliance with the applicable guidelines to protect scenic, cultural, natural and recreation resources [and other protective guidelines].

"2. Properties in all GMA land use designations except Open Space and Agriculture-Special with buildings included on the National Register of Historic Places, and which were former restaurants and/or inns shall be permitted to re-establish these former uses, subject to compliance with the applicable guidelines to protect scenic, cultural,

natural and recreation resources [and other protective guidelines] * * *.[9]

"3. Properties in all GMA land use designations except Open Space and Agriculture-Special with buildings included on the National Register of Historic Places shall be permitted to hold commercial events, subject to compliance with the applicable guidelines to protect scenic, cultural, natural and recreation resources [and other protective guidelines].

"4. The following additional review uses may be allowed in all GMA land use designations except Open Space and Agriculture-Special on a property with a building either on or eligible for the National Register [of] Historic Places and that was 50 years old or older as of January 1, 2006, subject to compliance with the applicable guidelines to protect scenic, cultural, natural and recreation resources * * * [listing ten types of commercial activities[10]]."

Management Plan, Part II, ch 7 (General Policies and Guidelines), Special Uses in Historic Buildings, GMA Guidelines, Additional Review Uses for Historic Buildings.

Friends sought judicial review in the Court of Appeals of the commission's final order adopting PA 05-02. In that court, Friends interposed three objections to the adoption of the plan amendment: (1) that conditions in the scenic area had not changed significantly enough to warrant amendment of the management plan under OAR 350-050-0030; (2) that the commission improperly rejected or failed to consider all practicable alternatives to PA 05-02 before adopting that amendment; and (3) that the plan amendment is not consistent with the purposes and standards of the Act. The Court of Appeals rejected all three arguments.

Before this court, Friends has abandoned its first argument, *viz.*, that the commission did not have authority to adopt PA 05-02 because conditions in the scenic area had not

---

[9] This second category would permit the use requested in the original View Point Inn application.

[10] The permissible commercial activities include, among other things, drinking establishments, outdoor and indoor commercial events, wineries, artist studios and galleries, conference and retreat facilities, and parking lots.

changed significantly enough to justify amending the management plan. Friends now limits its focus to its second and third arguments. Specifically, Friends argues that, because the commission did not discuss certain of Friends' proposed alternatives to PA 05-02 in its final order adopting PA 05-02, it failed to carry out its duty under OAR 350-050-0030(3) to determine that "[n]o practicable alternative to the proposed amendment more consistent with the purposes and standards of the Scenic Area Act exists." Friends also contends that the commission failed to carry out its duty under OAR 350-050-0030(2) to ensure that "[t]he proposed amendment is consistent with the purposes and standards of the Scenic Area Act," insofar as PA 05-02 permits certain commercial uses of resources in areas zoned for agricultural, forest, public recreation, and residential uses notwithstanding what Friends contends is the Act's mandate to allow large scale commercial uses only in urban areas and other areas zoned for such uses and notwithstanding the Act's requirement to protect and enhance agricultural and forest land for agricultural and forest uses.

Before we address Friends' substantive challenges to the commission's final order, we first consider two preliminary objections that Friends raises to the standards of review that the Court of Appeals used in evaluating its claims. Friends contends that the Court of Appeals erred in holding that, to succeed on a claim that PA 05-02 violates the Act, Friends must demonstrate that the plan cannot be applied consistently with the Act under any circumstance. Friends asserts that that standard is unduly restrictive. Rather, Friends asserts, it need only show that the challenged policies and guidelines depart from or contravene a legal standard expressed or implied in the Act. Friends also argues that the Court of Appeals further erred in holding that, when commission actions are reviewed in Oregon courts, the deferential standard of review set out in *Chevron USA, Inc. v. Natural Res. Def. Council*, 467 US 837, 104 S Ct 2778, 81 L Ed 2d 694 (1984), applies. Under that standard of review, when a federal agency has been charged by Congress with implementing a federal statute, courts are to defer to that agency's interpretation of the statute, treating it as controlling, as long as it is reasonable. On that point, Friends

argues that, because the commission is not, strictly speaking, a *federal* agency charged *by Congress* with implementing a federal law, this court should apply Oregon's statutory construction methods to the commission's interpretations of the Act.

■ This court considered both those contentions in *Friends of Columbia Gorge v. Columbia River (S055722)*, 346 Or 366, 213 P3d 1164 (2009) (*Friends (S055722)*). With respect to the first, we agreed with Friends and held that the stringent standard of review that the Court of Appeals used is not appropriate to the issues on review. We will not repeat that lengthy discussion here. It is sufficient for the purposes of this case to state that the management plan, both in its original and its revised (and, in this case, amended) form, is much like a "rule" as that term is defined in the Oregon APA: "any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency." ORS 183.310(9). *Friends (S055722)*, 346 Or at 376. Moreover, we observed, the plan was adopted and revised by the commission through a process that is similar to the rulemaking process prescribed in the Oregon APA at ORS 183.335. *Id.* We concluded that, although the commission is not a state agency that is directly subject to the Oregon APA, Friends' challenges to the management plan (and its revisions and amendments) nevertheless are analogous to typical "facial" challenges to the validity of a rule under the Oregon APA. Therefore, in reviewing the commission's action under ORS 196.115(3)(c) to (e), the court must consider the legal standard that a court would use in judicial review of a rule under the APA: whether the commission "departed from a legal standard expressed or implied in the particular law being administered, or contravened some other applicable statute." *Id.* at 377, *quoting Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984). That standard, we held, was the appropriate one to apply to Friends' facial challenge to the lawfulness of the management plan, rather than the "under any circumstances" test applied by the Court of Appeals, and the Court of Appeals therefore erred in that regard. *Id.* We take the same view here.

With respect to Friends' argument concerning the applicability of the deferential standard of review set out in *Chevron*, we agreed with the Court of Appeals that, in evaluating the commission's interpretation of the Act, it is appropriate to apply that standard. *Id.* at 384. We see no reason to repeat that discussion here, particularly because nothing in our review in this case implicates or requires *Chevron* deference.

We turn to Friends' substantive challenges to the commission's final order. As noted, Friends' objections are two-fold. Friends contends, first, that the Court of Appeals erred in concluding that the commission met its obligation under OAR 350-050-0030(3) to ensure that there is no practicable alternative to PA 05-02 more consistent with the Act. Second, Friends asserts that, to the extent that PA 05-02 allows new commercial uses and development in areas not zoned for such uses, it is inconsistent with the Act and the Court of Appeals erred in concluding to the contrary. As we shall explain, both of Friends' arguments rest on faulty assumptions.

■ Under OAR 350-050-0030, "[t]he Commission must find the following criteria are satisfied before it approves an amendment to the Management Plan: * * * (3) [n]o practicable alternative to the proposed amendment more consistent with the purposes and standards of the Scenic Area Act exists." As Friends reads the foregoing, it requires the commission to "show" that no practicable alternative exists, through *"some* evaluation of specific alternatives presented to [it]." (Emphasis in original.) Friends concludes that, because the final order does not set out an explanation of certain practicable and reasonable alternatives (in Friends' view) that Friends had proposed, and the reasons for the commission's rejection of them, the commission necessarily must have failed entirely to evaluate those alternatives.[11]

---

[11] The Court of Appeals understood Friends to be arguing that, because the commission is required to conclude that "no practicable alternative exists," it must consider and reject "each and every conceivable alternative." The court rejected that argument, concluding that that requirement means only that the commission must exercise some measure of discretion and act reasonably in the circumstances. *Friends,* 218 Or App at 249. Friends does not challenge that interpretation here. Rather, Friends contends only "that the commission must evaluate specific alternatives presented to it," but did not do so in this case.

And, according to Friends, that failure violated the commission's mandate under OAR 350-050-0030(3) and, consequently, the final order was "inconsistent with an agency rule, an officially stated agency position or a prior agency practice." ORS 196.115(3)(d)(B). Also implicit in Friends' argument is the assumption that certain of its proposed alternatives that the commission failed to consider were "more consistent with the purposes and standards of" the Act.

The commission responds that it considered the alternatives that Friends submitted as a "package," that nothing in the rule precludes it from considering them in that manner, and that it gave due consideration to all parts of that package, even if it did not refer specifically to some of the parts on its list of the package's "key elements" in its final order. And, having done so, the commission claims that it correctly concluded that Friends' proposed alternatives were no more consistent with the purposes and standards of the Act than PA 05-02, insofar as the text of PA 05-02 permits certain new commercial uses of historic properties "subject to compliance with the applicable guidelines to protect scenic, cultural, natural, and recreation resources." Management Plan, Part II, ch 7 (General Policies and Guidelines), Special Uses in Historic Buildings, GMA Guidelines, Additional Review Uses for Historic Buildings. In other words, the commission concluded that none of Friends' suggested alternatives ultimately would better serve the Act's dual purposes of protecting resources while at the same time protecting and supporting the economy of the area by allowing a measure of economic activity.

As the commission's response accurately suggests, the premise of Friends' argument is fallacious: the fact that the commission did not describe in the final order all the details of Friends' proposed alternative does not, without more, mean that the commission did not evaluate those details. As Friends itself points out and as the record reflects, Friends submitted a multi-part alternative proposal, along with a complete explanation of the impact of the various permutations, to each commissioner during the plan amendment comment period. The commission's final order states

that the commission considered Friends' proposed alternative. It is fair to take the commission at its word that it gave due consideration to all parts of Friends' proposal, and Friends has not identified any reason not to do so.

■ Moreover, to the extent that Friends can be understood to be arguing that the commission is required by its own rules or some other source of law to evaluate each and every aspect of Friends' suggested alternatives in the final order, that argument also fails. First, contrary to Friends' argument, the rule itself does not require the commission to "show" that no practicable alternative exists through an "evaluation" of specific alternatives, presumably in the final order. OAR 350-050-0030 merely provides that the commission "must find" that no practicable alternative to the proposed amendment more consistent with the Act exists.[12] In its final order, the commission did so find. In addition, although this court often has held that an administrative order must include findings that are adequate for meaningful judicial review, *see, e.g.*, *Doherty v. Oregon Water Resources Director*, 308 Or 543, 547, 783 P2d 519 (1989) (so stating); *Diack v. City of Portland*, 306 Or 287, 301, 759 P2d 1070 (1988) (same), we conclude that the commission's final order meets that standard here. The order listed what the commission believed to be the most relevant components of Friends' alternative, summarized the key points, and explained why Friends' alternative was not practicable and why it would provide less protection for historic buildings than PA 05-02. For all those reasons, we conclude, as did the Court of Appeals, that the commission met its obligation under OAR 350-050-0030(3) to ensure that there is no practicable alternative to PA 05-02 more consistent with the purposes and standards of the Act.

■ Finally, Friends argues that the Court of Appeals erred in concluding that PA 05-02 is "consistent with the purposes and standards of the Scenic Area Act." OAR 350-050-0030(2). According to Friends, the Act "allow[s] large-scale

---

[12] Friends does not engage in any kind of interpretive analysis of the words "must find" in OAR 350-050-0030 to show that those words mean that the commission must make specific findings in its order individually rejecting each alternative that was presented to it.

commercial uses and development only in urban areas and areas zoned for such uses," yet PA 05-02 permits numerous types of new commercial uses and development, including restaurants, bars, hotels, and wineries, in nearly the entire GMA, including on land zoned for agricultural, forest, recreational, and residential purposes, "without the suitability analysis required by the Act." Moreover, Friends argues, the commission did not zone particular areas for the commercial use of historic buildings, as Friends contends the Act requires, nor did the commission limit the scope of the plan amendment to areas already zoned for commercial uses. Finally, Friends contends that allowing commercial uses of historic properties throughout the GMA undermines the second purpose of the Act, which is to encourage commercial activity to occur in existing urban areas.

The problem with those arguments, as the Court of Appeals correctly observed, is that the Act does not contain the restrictions on commercial uses for which Friends contends. Friends points to 16 USC § 544d(b)(5) as authority for its position that the Act requires the commission to confine commercial uses and development outside of urban areas within specific areas designated as commercial zones. Section 544d of the Act generally describes what must be included in the management plan. Subsection (b) of that section provides:

"Within two years after the Commission is established, it shall develop land use designations for the use of non-Federal lands within the scenic area. The land use designations shall

"* * * * *

"(5)    designate lands in the scenic area outside the special management area used or suitable for commercial development: Provided, That such designation shall encourage, but not require, commercial development to take place in urban areas and shall take into account the physical characteristics of the areas in question and their geographic proximity to transportation, commercial, and industrial facilities and other amenities."

16 USC § 544d(b)(5). As the commission points out, the foregoing requirement to designate areas for commercial

development is simply a directive that the management plan include land use designations that permit commercial development in the scenic area, which the commission fulfilled by creating Commercial, Commercial Recreational, and Rural Center land use designations. In addition, the requirement to take various geographic and physical factors into account applies only to the commission's creation of land designations. The requirement does not, as Friends argues, "require" a "suitability analysis" before the commission may permit any commercial *use* in the scenic area. Indeed, another part of the same section, 16 USC § 544d(d)(7), requires the management plan to include a provision to "require that commercial development *outside urban areas* take place without adversely affecting the scenic, cultural, recreation, or natural resources of the scenic area." (Emphasis added.) In express compliance with that requirement, PA 05-02 permits various commercial uses of historic buildings "subject to compliance with the applicable guidelines to protect scenic, cultural, natural and recreation resources and [other historic building and cultural resource protection guidelines] and all Scenic, Recreation, Agriculture and Forest Lands Guidelines." In short, we conclude that 16 USC § 544d(b)(5) does not in any way speak to the commission's authority to permit commercial activities in other parts of the scenic area.[13]

We also fail to see how permitting certain new commercial uses of historic properties in the scenic area "undermines" the Act's stated purpose of "encouraging growth to occur in existing urban areas." 16 USC § 544a(2). Friends' contends that owners of historic buildings engaging in commercial uses of those properties will compete with businesses in urban areas, to the detriment of the urban businesses. That argument is completely inapposite. Even if the amendment can be viewed as encouraging *commercial use* of historic properties outside of existing urban areas, that result is not inherently inconsistent with the Act's second purpose to encourage *commercial development in* urban areas. And it

---

[13] Friends also seems to argue that PA 05-02 conflicts with certain provisions in the management plan as it was originally adopted in 1991, limiting commercial activities to areas designated for such activities. That argument, however, is a *non sequitur*, insofar as any amendment to the management plan, by its very nature, likely will be inconsistent with the original terms of the management plan.

certainly does not violate any provision of the Act. It follows that the Court of Appeals correctly concluded that Friends failed to identify how the plan amendment permits anything that the Act prohibits.

The decision of the Court of Appeals and the order of the Columbia River Gorge Commission are affirmed.