2012 COA 64

**The PEOPLE of the State of Colorado,
Petitioner–Appellee,**

**In the Interest of M.C.,
Juvenile–Appellant.**

**No. 11CA0941.**

Colorado Court of Appeals,
Div. IV.

April 12, 2012.

John W. Suthers, Attorney General, Nicole Wiggins, Assistant Attorney General, Denver, Colorado, for Petitioner–Appellee.

Law Offices of Robert P. Johns, Robert P. Johns, Mike Schneider, Denver, Colorado, for Juvenile–Appellant.

Opinion by Judge WEBB.

¶ 1 This case addresses whether section 33–6–117(1)(a), C.R.S.2011, proscribing willful destruction of wildlife, applies to a person who did not take the wildlife. M.C., a juvenile, appeals an adjudication of delinquency entered after a bench trial finding him guilty under subsection (II) of this section, primarily on the basis that this subsection is unconstitutionally vague. We reject the juvenile's constitutional challenge and conclude that having been the initial taker of wildlife is not required to prove a violation of section 33–6–117(1)(a)(II). Because the trial court found that the juvenile acquired possession of the wildlife and participated in concealing the carcass, which the juvenile does not challenge for insufficiency of evidence, we further conclude that the prosecution proved a violation of subsection (II), as we interpret it. Therefore, we affirm the judgment.

## I. Background

¶ 2 The juvenile was charged with willful destruction of wildlife for "unlawfully and intentionally abandon[ing] the carcass or

body of taken wildlife," section 33–6–117(1)(a)(II). Because the wildlife was big game, the offense constituted a class 5 felony. § 33–6–117(1)(b), C.R.S.2011.

¶ 3 The prosecution responded to the juvenile's motion for a bill of particulars as follows:

> [M.C.] abandoned the wildlife when he left the original kill site with the person who killed the wildlife. He went with the person who killed the wildlife back to a [sic] juvenile's house. He then returned to the scene with the person who killed the wildlife. He helped move the carcass from the original kill spot to a different location. He and the others then abandoned the wildlife.

The juvenile then moved to dismiss under Crim. P. 12(b) on the ground that the information failed to charge an offense. He argued that the prosecution had charged him only with violating section 33–6–117(1)(a)(II), which did not operate independently of the elements of section 33–6–117(1)(a)(I), especially that the actor had taken the wildlife. Alternatively, he argued that standing alone, section 33–6–117(1)(a)(II) was unconstitutionally vague because it does not identify what right or interest the actor must have in the wildlife before being vulnerable to prosecution for abandonment.

¶ 4 The court denied the juvenile's motion on two grounds. First, based on the plain language of the statute and *People v. Gordon*, 160 P.3d 284, 289 (Colo.App.2007), subsections (I) and (II) described alternative ways to commit willful destruction of wildlife. Second, the statute was not unconstitutionally vague because the juvenile had failed to prove that "a person [of] ordinary intelligence must guess at the meaning of C.R.S. 33–6–117(1)(a)(II)," which was "clear on its face." However, the court noted that while "[t]he statute does not require the juvenile to have killed the animal in question ... the Court does believe the juvenile may argue to this Court that the juvenile must have possessed the 'taken wildlife' in order to abandon it." [1]

¶ 5 The trial court found that the juvenile and two companions, T.P. and C.P., had gone out to shoot clay pigeons. When they encountered a pronghorn antelope, T.P. shot and killed it. The boys went to C.P.'s home, then returned that night with flashlights. They dragged the carcass down a hill and hid it under some bushes. The juvenile helped conceal the carcass, by either dragging it or holding a flashlight. No one took body parts from the carcass.

## II. Standard of Review

¶ 6 We review the interpretation of a statute de novo. *People v. Manzo*, 144 P.3d 551, 554 (Colo.2006). Because we presume statutes to be constitutional, the party challenging the facial constitutionality of a statute has the burden of showing that the statute is unconstitutional beyond a reasonable doubt. *Hinojos–Mendoza v. People*, 169 P.3d 662, 668 (Colo.2007).

## III. Sufficiency of the Record

¶ 7 Initially, we reject the Attorney General's contention that because the juvenile did not designate the transcript of any testimony, he failed to provide a sufficient record.

¶ 8 "A judgment entered by a court of general jurisdiction is presumed to be correct. Thus, it is the duty of the party asserting error to present a record demonstrating that error." *People v. Ullery*, 984 P.2d 586, 591 (Colo.1999) (internal citations omitted). Appellate rules governing composition of the record on appeal "insure that the appellate court will be given sufficient information to arrive at a just and reasoned decision." *City of Aurora v. Webb*, 41 Colo.App. 11, 13, 585 P.2d 288, 290 (1978).

¶ 9 Although C.A.R. 10(a) allows a party to make the transcript part of the record, it requires only the final pleadings; the findings of fact, conclusions of law, and judgment; and any post-trial motions and judgment. "The record need not be all-inclu-

---

1. The juvenile's counsel renewed his position during closing argument and the Attorney General agrees that he preserved this issue.

sive; rather, it will be deemed adequate if it contains sufficient information to enable the court to resolve the issues presented." *People v. Olson*, 921 P.2d 51, 52 (Colo.App.1996).

¶ 10 Here, the juvenile designated all filings in the case and trial exhibits, as well as a transcript of closing arguments and the court's rulings. Because he does not challenge the sufficiency of the evidence, a transcript of the testimony is unnecessary. Although we must presume omissions from the evidentiary record would support the judgment, *People v. Wells*, 776 P.2d 386, 390 (Colo.1989), we conclude that the juvenile has not forfeited his right to review of the trial court's statutory interpretation.

## IV. Analysis

¶ 11 Section 33–6–117(1)(a) provides:

(1) (a) Except as otherwise provided in articles 1 to 6 of this title or by rule of the commission, it is unlawful for a person:

(I) To hunt or take, or to solicit another person to hunt or take, wildlife and detach or remove, with the intent to abandon the carcass or body, only the head, hide, claws, teeth, antlers, horns, internal organs, or feathers or any or all of such parts;

(II) To intentionally abandon the carcass or body of taken wildlife; or

(III) To take and intentionally abandon wildlife.

The juvenile contends that a person cannot intentionally abandon the carcass of taken wildlife under subsection (II) without first having hunted or taken wildlife and removed parts, as prohibited in subsection (I). Alternately, he contends that if subsections (I) and (II) of section 33–6–117(1)(a) describe different ways of committing the same offense, subsection (II) is unconstitutionally vague. We consider and reject these contentions in turn.

### A. Statutory Interpretation

¶ 12 "Our fundamental responsibility in interpreting a statute is to give effect to the General Assembly's purpose and intent in enacting the statute." *Whitaker v. People*, 48 P.3d 555, 558 (Colo.2002) (internal

quotation marks and citation omitted). In so doing, we look first to the statute's language, and where the language is clear and unambiguous, "our analysis is complete and there is no need to resort to other rules of statutory construction." *People v. Simon*, 266 P.3d 1099, 1106 (Colo.2011). Where a statute is unclear or reasonably susceptible to different interpretations, however, we employ rules of statutory interpretation, in light of legislative history, prior law, a given construction's consequences, and the purpose of the statutory scheme. *People v. Luther*, 58 P.3d 1013, 1016 (Colo.2002).

¶ 13 We construe words and phrases according to the rules of grammar and common usage, unless the legislature has given them a technical meaning. *People v. Williamson*, 249 P.3d 801, 803 (Colo.2011); § 2–4–101, C.R.S.2011. We read the statute as a whole, "with a goal of giving consistent, harmonious, and sensible effect to all its parts." *People v. Summers*, 208 P.3d 251, 254 (Colo.2009). But we avoid construing a statute to render any of its words superfluous or to lead to an absurd result. *People v. Null*, 233 P.3d 670, 679 (Colo.2010).

¶ 14 The General Assembly stated its intent in enacting section 33–6–117 as follows:

The purpose and intent of this section is to protect the wildlife of this state from wanton, ruthless, or wasteful destruction or mutilation for their heads, hides, claws, teeth, antlers, horns, internal organs, or feathers, from being taken and abandoned, or any or all of the foregoing, and the provisions of this section shall be so construed.

§ 33–6–117(2), C.R.S.2011.

### B. Subsections (I) and (II) Describe Independent Means of Violating Section 33–6–117

¶ 15 We first reject the Attorney General's contention that the juvenile lacks standing to argue the interplay between subsections (I) and (II) because he was not charged under subsection (I). A defendant has standing to challenge a statute's constitutionality to the extent "he himself is adversely affected." *People v. Wimer*, 197 Colo. 191, 193, 591 P.2d 87, 88 (1979) (internal quotation

marks and citation omitted). Because we interpret a statute as a whole, giving consistent, harmonious, and sensible effect to all its parts, here interpretation of subsection (I) affects the interpretation of subsection (II). *See also People in Interest of C.M.*, 630 P.2d 593, 594 (Colo.1981) ("Where ... the constitutional challenge is to those very statutory terms which constitute the basis of the underlying prosecution, requisite standing exists."). Nonetheless, we reject the juvenile's contention for two reasons.

¶ 16 First, the plain language of subsections (I) and (II) describe different ways of committing willful destruction of wildlife. The juvenile was charged under the current version of section 33–6–117(1)(a), in which each subsection is separated by a semicolon, and subsections (II) and (III) are linked by the disjunctive "or." *Armintrout v. People*, 864 P.2d 576, 581 (Colo.1993) ("[W]hen the word 'or' is used in a statute, it is presumed to be used in the disjunctive sense, unless legislative intent is clearly to the contrary."). Thus, "by joining alternatives disjunctively in a single provision of the criminal code, the legislature intended to describe alternate ways of committing a single crime." *People v. Abiodun*, 111 P.3d 462, 467 (Colo.2005).[2]

¶ 17 Second, in *Gordon*, 160 P.3d at 289, decided under an earlier version of section 33–6–117(1),[3] the division rejected the defendant's assertion that the trial court had erroneously instructed the jury that the required mental state for taking and abandoning wildlife was "knowingly" rather than "with intent," because "with the intent to abandon the carcass or body" applied to the entire section. The division explained:

> Giving proper effect to all the words in § 33–6–117(1) requires recognition that the General Assembly has established separate offenses. With the words "to hunt or take ... wildlife and detach or remove, with the intent to abandon the carcass or body, only the head, hide, claws, teeth, antlers, horns, internal organs, or feathers or any or all of such parts," the General Assembly has made it an offense to hunt or kill an animal with the intent to keep only certain parts and to abandon the rest of the carcass. The offense applicable here, however, is found in the words "to abandon the carcass or body of such wildlife; or to take and abandon wildlife." This offense involves only the taking and abandoning of an animal, without regard for the actor's purpose or intention.

*Id.*; *see also People v. Lawrence*, 55 P.3d 155, 163 (Colo.App.2001) (reaching same conclusion for an earlier version of the statute containing the same language currently in subsection (I)), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

¶ 18 In 2008, the statute was amended to divide the paragraph into subsections (I), (II), and (III), and to add the mental state "intentionally" to subsections (II) and (III). Ch. 159, sec. 2, § 33–6–117(1), 2008 Colo. Sess. Laws 537–38. Legislative history shows that although the bill originally proposed eliminating the language now found in subsections (II) and (III), this proposal failed.[4] The amendment did not otherwise

---

**2.** *See People v. Valenzuela*, 216 P.3d 588, 591 (Colo.2009) (concluding statute created "one offense, within which are three separate categories of proscribed actions, offset by the word 'or' and semicolons"); *Armintrout*, 864 P.2d at 582 (where statute defined second degree burglary as knowingly (1) breaking an entrance into, (2) entering, or (3) remaining unlawfully in a building or occupied structure, use of "or" made clear these constituted "alternate ways of committing the same crime" and proof of breaking was not required).

**3.** "Except as is otherwise provided in articles 1 to 6 of this title or by rule of the commission, it is unlawful for a person to hunt or take, or to solicit another person to hunt or take, wildlife and detach or remove, with the intent to aban-

don the carcass or body, only the head, hide, claws, teeth, antlers, horns, internal organs, or feathers or any or all of such parts; to abandon the carcass or body of such wildlife; or to take and abandon wildlife." Ch. 144, sec. 3, § 33–6–117(1), 2003 Colo. Sess. Laws 1029.

**4.** Summary of S.B. 08–69 before the H. Agric., Livestock, & Natural Res. Comm., 66th Gen. Assemb., 2d Sess. (Mar. 12, 2008), *available at* http://www.leg.state.co.us/clics/clics2008a/csl.nsf/fsbillcont3/BAA75A704C666897872573A80068EB71?open&file=069_01.pdf; Summary of S.B. 08–69 before the H. Judiciary Comm., 66th Gen. Assemb., 2d Sess. (Mar. 19, 2008), *available at* http://www.leg.state.co.us/clics/clics2008a/csl.nsf/fsbillcont3/BAA75A704C666897872573A80068EB71?open&file=069_01.pdf.

alter the language held in *Gordon* to constitute an independent offense, nor did it indicate that a violation of subsection (II) depended on engaging in any of the acts described in subsection (I).

¶ 19 We reject the juvenile's argument that because "none of the acts set forth in Subpart (I) result in a violation of this Statute unless the wildlife is actually abandoned as set forth in Subpart (II)," the only way to acquire an interest in a carcass sufficient to abandon it under subsection (II) is to hunt or take the wildlife as identified in subsection (I). The plain language of subsection (II) does not require engaging in an additional act to commit a criminal offense.[5]

¶ 20 Accordingly, we conclude that section 33–6–117(1)(a) describes three independent ways of committing the willful destruction of wildlife.

### C. Section 33–6–117(1)(a)(II) Is Not Void for Vagueness

¶ 21 A law violates a defendant's due process rights when "it fails to give fair notice of the conduct prohibited and does not supply adequate standards to prevent arbitrary and discriminatory enforcement." *People v. Hickman*, 988 P.2d 628, 643 (Colo. 1999). An unconstitutionally vague law fails to·clearly define its prohibitions, and may be reasonably susceptible to more than one interpretation by a person of common intelligence. *Id.* However, "a criminal statute need not contain precise definitions of every word or phrase constituting an element of the offense." *People v. Janousek*, 871 P.2d 1189, 1196 (Colo.1994). Thus, a law is unconstitutional only if it is "vague, not in the sense that it requires a person to conform his

conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Hickman*, 988 P.2d at 643 (internal quotation marks and citations omitted).

¶ 22 To succeed in a facial challenge, the complaining party must show that the statute is " 'impermissibly vague in all of its applications.'" *People v. Baer*, 973 P.2d 1225, 1233 (Colo.1999) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). Because we must construe statutory terms in a manner that avoids constitutional infirmities, "if a statute is capable of alternative constructions, one of which is constitutional, then the constitutional interpretation must be adopted." *People v. Zapotocky*, 869 P.2d 1234, 1240 (Colo. 1994).

¶ 23 The juvenile argues that subsection (II) is unconstitutionally vague because a person can only abandon something in which that person has a right or interest, but the subsection does not describe the acts necessary to establish such a right or interest. In rejecting this argument, we look first at the degree of specificity required, and then at the operative terms: "taken" and "abandon."

#### 1. *Flipside* Test

¶ 24 The degree of specificity required to defeat a vagueness challenge depends on the nature of the statute at issue. *Flipside*, 455 U.S. at 498–99, 102 S.Ct. 1186; *Parrish v. Lamm*, 758 P.2d 1356, 1366 (Colo. 1988). If the statute regulates economic activities, imposes civil penalties, or contains a scienter requirement, a lesser degree of

---

**5.** And like subsection (I), many other statutes similarly criminalize conduct coupled with a specific intent. *See, e.g.*, § 18–1–603, C.R.S.2011 ("A person is legally accountable as principal for the behavior of another constituting a criminal offense if, with the intent to promote or facilitate the commission of the offense, he or she aids, abets, advises, or encourages the other person in planning or committing the offense."); § 18–3–302(2), C.R.S.2011 ("Any person who takes, entices, or decoys away any child not his own under the age of eighteen years with the intent to keep or conceal the child from his parent or guardian or with the intent to sell, trade, or

barter such child for consideration commits second degree kidnapping."); § 18–7–502(3), C.R.S. 2011 ("It shall be unlawful for any child falsely to represent ... that he is eighteen years of age or older, with the intent to procure any material set forth in subsection (1) of this section."); § 18–8–302(1), C.R.S.2011 ("A person commits the crime of bribery, if: (a) He offers, confers, or agrees to confer any pecuniary benefit upon a public servant with the intent to influence the public servant's vote, opinion, judgment, exercise of discretion, or other action in his official capacity.").

specificity is required than if the statute imposes criminal penalties or inhibits the exercise of constitutional rights. *Parrish,* 758 P.2d at 1366; *Robertson v. City & Cnty. of Denver,* 978 P.2d 156, 160 (Colo.App.1999). However, "[t]he standards for evaluating a vagueness challenge should not be applied mechanically. Therefore, a mere tally of the four *Flipside* factors will not suffice." *Parrish,* 758 P.2d at 1366 (internal citation omitted). Rather, the most important factor is whether the statute at issue inhibits the exercise of constitutional rights. *Id.*

¶ 25 Section 33–6–117(1)(a) is not an economic regulation and imposes criminal penalties. But it contains the requirement that the violator act intentionally and it does not inhibit the exercise of constitutional rights. Further, "a clear designation of legislative intent can compensate for some imprecision in terms." *Id.* at 1368; *see* § 33–6–117(2). Hence, we conclude that a lesser degree of specificity is required.

### 2. "Taken"

¶ 26 Subsection (II) requires that the wildlife at issue was "taken." Section 33–1–102(43), C.R.S.2011, defines "take" as "to acquire possession of wildlife" (excluding "the accidental wounding or killing of wildlife by a motor vehicle, vessel, or train").

¶ 27 Nevertheless, because "taken" is used in the passive voice, it creates ambiguity by failing to identify the actor. *See, e.g., Jefferson Cnty. Bd. of Equalization v. Gerganoff,* 241 P.3d 932, 936 (Colo.2010) (key verb phrase in statutory provision created ambiguity as to the intended actor when written in passive voice); *Friends of Columbia Gorge, Inc. v. Columbia River Gorge Comm'n,* 218 Or.App. 261, 179 P.3d 700, 704 (2008) (concluding that passive voice in phrase "may be allowed" rendered statute ambiguous by not making clear *"who* may do

the allowing" (emphasis in original)), *aff'd,* 346 Or. 415, 212 P.3d 1243 (2009).

¶ 28 However, ambiguity alone does not make a statute unconstitutionally vague. "Only when legislation is so vague, indefinite, and uncertain that the courts are unable to determine, with reasonable certainty, what the legislature intended, or so incomplete and inconsistent in its provisions that it cannot be executed will it be struck down as unconstitutionally vague." *Board of Cnty. Comm'rs v. City & Cnty. of Denver,* 194 Colo. 252, 257, 571 P.2d 1094, 1098 (1977).

¶ 29 We begin that inquiry by reading subsection (II) in the context of the entire statute. *Williamson,* 249 P.3d at 803; *see also Montez v. People,* 2012 CO 6, ¶ 19, 269 P.3d 1228 (interpreting meaning of passive phrase "intended to be used" in context of remainder of statute); *DaimlerChrysler Servs. N. Am., LLC v. State Tax Assessor,* 817 A.2d 862, 865 (Me.2003) (any ambiguity caused by the passive voice should be resolved by reviewing entire statute). While "the inclusion of several definite elements in a criminal statute cannot solve the constitutional deficiency created by the failure of the legislature to define a critical element of the statute with sufficient certainty," *People v. Pratt,* 759 P.2d 676, 687 (Colo.1988), here the statutory scheme as a whole provides sufficient certainty to subsection (II).

¶ 30 Subsection (III)'s use of the active voice ("to take and intentionally abandon wildlife") creates criminal liability where the taker also abandons. The same is true of subsection (I) ("to hunt or take ... with the intent to abandon"). In contrast, use of the passive voice in subsection (II) fills a gap by creating criminal liability for abandonment by someone other than the initial taker. Such an interpretation is consistent with construction of the passive voice as expressing legislative desire for expansive application.[6] Criminalizing abandonment by someone oth-

---

6. *See, e.g., Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1206 (10th Cir.2003) (passive voice of Fourth Amendment neither limits nor specifies the governmental actors who are to be constrained); *San Leandro Teachers Ass'n v. Governing Bd. of San Leandro Unified Sch. Dist.,* 65 Cal.Rptr.3d 288, 295 (Cal.Ct.App.2007) (legislature deliberately chose passive voice, not specify-

ing identity of actor, to avoid limiting statute's application), *aff'd,* 46 Cal.4th 822, 95 Cal.Rptr.3d 164, 209 P.3d 73 (2009); *cf. Alvarez v. District Ct.,* 186 Colo. 37, 41, 525 P.2d 1131, 1133 (1974) (declining to interpret passive voice as expanding the actors to whom statutory provision could apply only because such expansion contradicted legislative intent).

er than the initial taker of the wildlife also comports with the legislature's stated purpose "to protect the wildlife of this state ... from being taken and abandoned, or *any* or all of the foregoing." § 33–6–117(2) (emphasis added).

¶ 31 Therefore, we conclude that a person of common intelligence has sufficient notice that subsection (II) could apply to his or her abandonment of wildlife taken by another person.

### 3. "Abandon"

¶ 32 The Colorado wildlife statutes do not define "abandon." In the absence of a statutory definition, we "may refer to dictionary definitions to determine the plain and ordinary meanings of those words." *People v. Daniels*, 240 P.3d 409, 411 (Colo.App.2009).

¶ 33 In *People v. Dobson*, 847 P.2d 176, 179 (Colo.App.1992), a division of this court compared the definitions of abandon in general purpose dictionaries with the definition in *Black's Law Dictionary* and concluded that the same concepts were present in both. *See Kwiatkoski v. People*, 706 P.2d 407, 409 (Colo.1985) (where same concepts exist in judicial descriptions and dictionary definitions of a word, general understanding of word is clear and needs no further definition). *Webster's Third New International Dictionary* 2 (1971) defines abandon as "to cease to assert or exercise an interest, right, or title to esp. with the intent of never again resuming or reasserting it: yield, relinquish." *Id.* The American Heritage Dictionary 2 (1975) defines it as "1. to forsake; desert. 2. to surrender one's claim or right to; give up." *Id.* And *Black's Law Dictionary* 2 (5th ed. 1979) defines abandon as

To desert, surrender, forsake, or cede. To relinquish or give up with intent of never again resuming one's right or interest. To

give up or to cease to use. To give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connection with or concern in; to desert. It includes the intention, and also the external act by which it is carried into effect.

*Id.*

Under these definitions of abandon, a person of common intelligence would understand subsection (II) to impose liability where the actor has acquired an interest or right in the carcass of wildlife taken by another and then abandoned it. This liability is distinct from that imposed on the initial taker of the wildlife, in that the right or interest may be acquired after the initial taking but before abandonment. This distinction between these two categories of offenders gives effect to both subsection (II) and subsection (III), without rendering either superfluous.[7] Where the actor has initially taken wildlife and then abandons the carcass, prosecution would lie under subsection (III). But where the actor subsequently comes into possession of the wildlife and then abandons the carcass, prosecution would lie under subsection (II). Neither subsection would allow for prosecution of a mere bystander to the taking who was present when the carcass was abandoned.[8]

¶ 34 Applying this distinction here, the trial court found that the juvenile possessed the antelope by dragging the carcass, and he assisted in concealing it. This finding is consistent with the definition of possession in section 33–1–102(34), C.R.S.2011, which includes "any control over." Because the juvenile did not designate transcript of the testimony, we must assume that a complete record would support the finding. Therefore, although the trial court did not have the benefit of our interpretation of the statute,

---

7. Construing "to intentionally abandon the carcass or body of taken wildlife" to apply to wildlife that the actor has taken, would leave no difference between subsection (II) and subsection (III). Because each subsection carries the same penalty, such duplication would not cause the juvenile harm. However, given our obligation to carry out the legislature's intent by giving effect to all statutory provisions, without rendering any words superfluous, we must avoid this interpretation.

8. The juvenile did not argue below that because the animal had been abandoned at the kill site earlier in the day, he could not be prosecuted for his later act of acquiring possession, as the trial court found. Hence, we express no opinion whether subsection (II) could be applied to a "second" abandonment.

we conclude that its findings support adjudication under subsection (II).

¶ 35 The judgment is affirmed.

Judge RUSSEL concurs.

Judge FURMAN dissents.

Judge FURMAN dissenting.

¶ 36 I conclude M.C., the juvenile, did not violate the willful destruction of wildlife statute, § 33–6–117, C.R.S.2011, because the juvenile did not acquire an interest in the antelope by either (1) being present when it was shot, or (2) later returning to the scene to hide the carcass. I also conclude that the statute under which the juvenile was adjudicated a delinquent, § 33–6–117(1)(a)(II), C.R.S.2011, is unconstitutionally vague. Thus, I respectfully dissent.

¶ 37 Section 33–1–101, C.R.S.2011, defines all the acts by which someone may lawfully acquire an interest in the wildlife of this state:

(1) It is the policy of the state of Colorado that the wildlife and their environment are to be protected, preserved, enhanced, and managed for the use, benefit, and enjoyment of the people of this state and its visitors....

(2) All wildlife within this state not lawfully acquired and held by private ownership is declared to be the property of this state. Right, title, interest, acquisition, transfer, sale, importation, exportation, release, donation, or possession of wildlife shall be permitted only as provided in articles 1 to 6 of this title or in any rule or regulation of the wildlife commission.

¶ 38 Section 33–6–117 protects the wildlife of this state by proscribing ways a person may acquire an interest in wildlife:

(1)(a) ... [I]t is unlawful for a person:

(I) To hunt or take, or to solicit another person to hunt or take, wildlife and detach or remove, with the intent to abandon the carcass or body, only the head, hide, claws, teeth, antlers, horns, internal organs, or feathers or any or all of such parts;

(II) To intentionally abandon the carcass or body of taken wildlife; or

(III) To take and intentionally abandon wildlife.

. . . .

(2) The purpose and intent of this section is to protect the wildlife of this state from wanton, ruthless, or wasteful destruction or mutilation for their heads, hides, claws, teeth, antlers, horns, internal organs, or feathers, from being taken and abandoned, or any or all of the foregoing, and the provisions of this section shall be so construed.

¶ 39 I respectfully contend that, if subsection (1)(a)(II) is read to constitute a separate crime, the statute is unduly vague in violation of the Fourteenth Amendment.

I.  Protecting Wildlife by Preventing Waste of the Carcass

¶ 40 The parties do not dispute that a different juvenile alone shot and killed the antelope. Yet, the juvenile here was convicted only under section 33–6–117(1)(a)(II), for intentionally abandoning the carcass or body of taken wildlife. I agree with the majority that wildlife cannot be abandoned by a person unless the person has a possessory interest in the animal and the concomitant intent to abandon the carcass. I believe, however, that such an interest is not derived from the common meaning of the word "abandoned," but rather is identified in subsection (1)(a)(I) of the statute.

¶ 41 Subsection (1)(a)(I) proscribes ways in which the actor may acquire an interest in wildlife. These include the actor hunting or taking the wildlife, or soliciting another to do so, and removing parts, with the intent to abandon the rest of the carcass. This is directed at trophy hunting. Section 33–1–102(3), C.R.S.2011, defines "carcass" as "the dead body of any wildlife or a portion thereof."

¶ 42 Subsection (1)(a)(III) of the willful destruction of wildlife statute prohibits taking and intentionally abandoning the entire carcass. It includes the thrill kill scenario where the animal is taken purely for sport and the entire carcass is wasted. That is the subsection the other juvenile appears to have violated when he shot the antelope.

¶ 43 Although the majority reasons that subsection (1)(a)(II), by virtue of its use of the passive voice, creates criminal liability for "abandonment by someone other than the initial taker" of the wildlife, I believe this reasoning leads to unreasonable results, including the fact that the juvenile here is punished for having the intent to abandon the carcass of wildlife that had *already* been wasted (because the antelope had been shot and abandoned by the other juvenile hours before).

¶ 44 The definitions of several statutory terms, all of which refer to active rather than passive conduct, support my view. "Hunt" means "to pursue, attract, stalk, lie in wait for, or attempt to shoot, wound, kill, trap, capture, collect, or take wildlife." § 33–1–102(25.5), C.R.S.2011. "Take" means "to acquire possession of wildlife." § 33–1–102(43), C.R.S.2011. "Possession" means "either actual or constructive possession of or any control over the object referred to." § 33–1–102(34), C.R.S.2011.

¶ 45 Moreover, because the proscribed taking deprives the people of this state of the use, benefit, and enjoyment of the wildlife at the time the wildlife is killed, *see* § 33–1–101(2), I believe the legislature intended to define the prohibited possessory interest as occurring at that time and not hours later by someone uninvolved in the taking.

¶ 46 I also believe that the inherently undefinable, and expansive, identity of a person who is deemed to obtain possession of a wildlife carcass by, for example, acquiring some undefined right or interest in that carcass "after the initial taking but before abandonment" as the majority believes occurred here, creates liability beyond that defined by the legislature. For instance, would a curious hiker who stumbles on the carcass of a deer recently shot and killed, grasps its foreleg, and then thinks to herself, "Such a shame," releases the foreleg, and goes on her merry way, be determined to have possessed the carcass and thereby deemed to have committed a felony for intentionally abandoning the carcass or body of taken wildlife? Or would a different hiker who, having heard the shot that killed an elk, comes running up to the carcass of the elk after the shooter and

any companions left, rolls the carcass over with his boot, decides the meat on the carcass was not worth saving, and leaves the carcass be determined to have possessed the animal and thereby committed a similar felony?

¶ 47 Because the juvenile here was not charged under subsection (1)(a)(I), and the prosecutor did not allege the juvenile was complicit in the taking and abandoning of the antelope under subsection (1)(a)(III), I would reverse the juvenile's adjudication.

## II.  Void for Vagueness

¶ 48 In addition, I conclude that section 33–6–117(1)(a)(II), standing alone, violates the Fourteenth Amendment's protection against arbitrary and capricious government laws and actions.

¶ 49 "A law that is unduly vague violates the Due Process Clause of the Fourteenth Amendment." *Independence Inst. v. Coffman*, 209 P.3d 1130, 1136–37 (Colo.App.2008). "The vagueness doctrine helps to ensure that a law is sufficiently definite so that citizens will be alerted to the conduct that is proscribed and they may act accordingly, and so that the law will not be arbitrarily applied." *Id.* at 1137. "A law is vague where persons of ordinary intelligence must necessarily guess as to its meaning and differ as to its application." *Id.*

¶ 50 In my view, the acts necessary to establish a possessory interest in the wildlife such that its body or carcass could be abandoned under subsection (1)(a)(II), standing alone, is not defined, leaving the courts and the actor to guess as to what the law proscribes. Thus, I conclude that this statute, when read in isolation, is void for vagueness.

¶ 51 I agree with the majority that the term "taken" used in this subsection "creates ambiguity by failing to identify the actor." Assuming it does apply to a third party who was not the initial taker, however, I conclude this subsection does not define what conduct of that third party would be proscribed. As applied to the juvenile's situation, the statute does not define which of his acts, after the point at which he witnessed the other juvenile shoot and abandon (and thereby waste)

the antelope, would suffice for criminal liability.

¶ 52 And imposing liability under the destruction of wildlife statute for the juvenile's conduct that occurred after the animal had already been taken and abandoned, in my view, creates confusion as to what conduct constitutes abandonment. The dictionary definitions of abandonment cited by the majority do not delineate what possessory interest a person has when he or she drags an already wasted carcass or assists in concealing it. This confusion was evidenced by the trial court, which provided an alternative ruling supporting the juvenile's adjudication that, because the juvenile was present and holding a flashlight, he was part of the plan. That is, apparently the trial court did not believe that the juvenile needed to touch the carcass to abandon it.

¶ 53 The majority assumes that the juvenile "acquired an interest or right in the carcass of wildlife taken by another" because he may have dragged the carcass and assisted in concealing it. However, because the juvenile here was not charged as an accessory after the fact, I would reverse the adjudication of delinquency.

¶ 54 For the foregoing reasons, I respectfully dissent.